FILED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

2025 OCT -9 P 1:03

| | |
|---|---|
| KIRK RUSSEL MARSH,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF UTAH; JUDGE MICHAEL EDWARDS; DANA EMMONS,<br><br>Defendant | Case No.: 1:24-CV-516<br><br>JUDGE PATRICIA TOLLIVER GILES<br>MAGISTRATE JUDGE IVAN D. DAVIS |

# MOTION FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULES OF CIVIL PROCEDURE 60(b)(6)

Plaintiff Kirk Russel Marsh, proceeding pro se, respectfully moves this Court for relief from the judgment of district dismissal entered on September 13, 2024 and appellate affirmation issued December 9, 2024, pursuant to Federal Rule of Civil Procedure 60(b)(6).

Dated this 9th of October, 2025.

Kirk Russel Marsh

Kirk Russel Marsh, Pro Se

10036 Glenmere Rd, Fairfax, VA22032
(571) 430 - 9473
kirkrussel@gmail.com

TABLE OF CONTENTS

INTRODUCTION .......... 6

II. LEGAL STANDARD .......... 7

III. STATE NOTICE, CONTINUING VIOLATIONS, AND EXTRAORDINARY CIRCUMSTANCES .......... 7

IV. STRUCTURAL UNDERMINING OF THE FEDERAL ACTION LEADING TO ONGOING HARM .......... 12

V. PROCEDURAL MANIPULATION AND THREAT OF IMMINENT INCARCERATION .......... 17

VI. FACTUAL BACKGROUND AND POST JUDGMENT FILINGS .......... 23

VII. FINANCIAL ENTRAPMENT AND FRAUD .......... 33

VIII. KIRK AND SHAWNEE MARSH — THIRD-PARTY FINANCIAL BURDEN AND CONTINUING CONSTITUTIONAL VIOLATIONS .......... 36

IX. ARGUMENT .......... 40

X. RELIEF REQUESTED .......... 45

XI. TABLE OF EXHIBITS .......... 47

TABLE OF AUTHORITIES

United States Supreme Court Cases

*Ackermann v. United States* .................................................... 340 U.S. 193 (1950)

*Agostini v. Felton* ..........................................................521 U.S. 203, 239 (1997)

*Allen v. McCurry* ................................................................... 449 U.S. 90 (1980)

*Ashcroft v. Free Speech Coalition* ........................................... 535 U.S. 234 (2002)

*Banks v. Dretke* ...................................................................... 540 U.S. 668 (2004)

*BFP v. Resolution Trust Corp.* ................................................. 511 U.S. 531 (1994)

*Blue Diamond Coal Co. v. Trustees of UMWA*

*Combined Benefit Fund*............................. 249 F.3d 519, 524 (6th Cir. 2001)

*Caperton v. A.T. Massey Coal Co.* .......................................... 556 U.S. 868 (2009)

*City of Canton v. Harris* ......................................................... 489 U.S. 378 (1989)

*Connick v. Thompson* ............................................................. 563 U.S. 51 (2011)

*Dennis v. Sparks* ........................................................... 449 U.S. 24, 27–28 (1980)

*Fuentes v. Shevin* ................................................................... 407 U.S. 67 (1972)

*Gonzalez v. Crosby* ................................................................ 545 U.S. 524 (2005)

*Hansberry v. Lee* ..................................................................... 311 U.S. 32 (1940)

*Hartman v. Moore* ........................................................... 547 U.S. 250, 256 (2006)

*Hazel-Atlas Glass Co. v. Hartford-Empire Co*................. 322 U.S. 238, 246 (1944)

*Heck v. Humphrey* ................................................................. 512 U.S. 477 (1994)

*Hensley v. Municipal Court* .................................................... 411 U.S. 345 (1973)

*In re Murchison*................................................................ 349 U.S. 133, 136 (1955)

*Klapprott v. United States* .......................................... 335 U.S. 601, 614–15 (1949)

*Lapidis v. Board of Regents of*

*University System of Georgia* .........................287 F.3d 1374 (11th Cir. 2002)

*Liljeberg v. Health Services Acquisition Corp.* ......................... 486 U.S. 847 (1988)

*Lugar v. Edmondson Oil Co*............................................. 457 U.S. 922, 939 (1982)

*Mitchum v. Foster* ................................................................. 407 U.S. 225 (1972)

*Monell v. Department of Social Services* ................................ 436 U.S. 658 (1978)

*Monroe v. Pape* ...................................................................... 365 U.S. 167 (1961)

*Owen v. City of Independence* ................................................ 445 U.S. 622 (1980)

*Papasan v. Allain* ................................................................... 478 U.S. 265 (1986)

*Phelps v. Alameida* .........................................569 F.3d 1120, 1135 (9th Cir. 2009)

*Preiser v. Rodriguez* ............................................................. 411 U.S. 475 (1973)

*Roadway Express, Inc. v. Piper* ....................................... 447 U.S. 752, 764 (1980)

*Soldal v. Cook County* ............................................................ 506 U.S. 56 (1992)

*Stanley v. Illinois* .................................................................. 405 U.S. 645 (1972)

*Tumey v. Ohio* ........................................................................ 273 U.S. 510 (1927)

*United States v. Estate of Romani* ........................................... 523 U.S. 517 (1998)

*United States v. Throckmorton* .................................................. 98 U.S. 61 (1878)

*Ungar v. Sarafite* ................................................................ 376 U.S. 575 (1964)

*Ward v. Village of Monroeville* ............................................... 409 U.S. 57 (1972)

*Yick Wo v. Hopkins* .................................................. 118 U.S. 356, 373–74 (1886)

*Zadvydas v. Davis* ................................................................ 533 U.S. 678 (2001)

United States Courts of Appeals

*FTC v. Ross* ............................................................ 743 F.3d 886 (4th Cir. 2014)

*Gallo v. U.S. District Court for the*

*District of Arizona*.................................................... 349 F.3d 1169 (9th Cir. 2003)

State Appellate and Supreme Court Cases

*In re Marriage of Hoff* ............................... 766 N.W.2d 271 (Minn. Ct. App. 2009)

*In re Marriage of Melville* ................................ 18 P.3d 570 (Wash. Ct. App. 2001)

*In re Marriage of Riddle* ....................... 125 Cal. Rptr. 2d 642 (Cal. Ct. App. 2002)

*In re Marriage of T.H.* ................................. 913 N.W.2d 578 (Iowa Ct. App. 2018)

*In re Custody of H.S.H.-K.* ........................................ 533 N.W.2d 419 (Wis. 1995)

*Maldonado v. Maldonado* ...................... 789 A.2d 1142 (Md. Ct. Spec. App. 2002)

Other Authorities

Federal Rule of Civil Procedure 60(b)(6) ......................................................

Extraordinary relief provision for reopening judgments under exceptional circumstances.

Candice Kulbeth, Amicus Curiae Brief in Support of Petition for Rehearing En Banc, *Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints*..............................No. 23-4110 (10th Cir. Sept. 19, 2025)

## INTRODUCTION

This Court dismissed Plaintiff Russel Marsh's complaint without prejudice on September 13, 2024, for lack of subject-matter jurisdiction, and did not reach the merits of Plaintiffs' constitutional claims. Since that dismissal, post-judgment developments have transformed the matter from speculative harm into imminent deprivation of liberty, parental rights, and property. Russel now faces incarceration under enforcement proceedings that rely on the dismissed federal complaint and judicial contamination. The federal dismissal itself enabled new constitutional harm. These circumstances constitute the type of extraordinary post-judgment developments that warrant relief under Federal Rule of Civil Procedure 60(b)(6).

This motion arises within a broader constitutional context. On October 2, 2025, the United States Court of Appeals for the Tenth Circuit accepted the *Amicus Curiae* brief of Candice Kulbeth in *Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints*, No. 23-4110. That filing, now part of the federal record, warns of the procedural extinction of rights through doctrines such as *Rooker-Feldman* and categorical church-autonomy bars—the same structural defects raised here. The Tenth Circuit's recognition of those issues underscores their national importance and situates *Marsh v. Utah* within a developing constitutional dialogue across circuits. (*see Exhibit 29 - Gaddy Amicus Brief)*

Against this backdrop, Russel seeks relief under Rule 60(b)(6) to reopen the judgment and restore jurisdiction. The *Motion* presents not only extraordinary circumstances but a live opportunity for this Court to address a federally acknowledged due-process dilemma and to prevent the manifest injustice that would result from leaving the prior dismissal in place.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(6) authorizes relief from a final judgment for "any other reason that justifies relief." Relief is warranted in "extraordinary circumstances" where denying reopening would result in "manifest injustice." *See Liljeberg v. Health Services Acquisition Corp.* 486 U.S. 847 (1988) ("Rule 60(b)(6) relief is reserved for extraordinary circumstances."). Russel respectfully submits that such circumstances are present here.

## III. STATE NOTICE AND CONTINUING VIOLATIONS

When this Court dismissed Russel's § 1983 complaint on September 13, 2024, it did so on jurisdictional grounds only. The merits of the constitutional allegations—systemic bias, ecclesiastical interference, and denial of due process—were never reached. Yet from service of the *Initial Complaint* forward, the State of Utah and its agents were on unmistakable notice of those violations and chose escalation over correction.

### 1 - Actual Notice

The *Complaint* and subsequent district and appellate filings placed squarely before the State four core allegations:

1. that Judge Michael Edwards, ruling outside jurisdiction, issued punitive orders that violate constitutional rights by - including but not limited to - implicating third parties, placing Russel in a position of judicial entrapment, and create prospective damages to Kirk Russel Marsh, Kirk David Marsh, Shawnee Marsh, and the three Marsh minor children;
2. that ecclesiastical authority, through Presiding Bishop W. Christopher Waddell, was allowed to influence judicial outcomes;
3. that non-parties Kirk and Shawnee Marsh were compelled to fund state-ordered obligations without standing or forum access; and
4. that the court ordered and judicially empowered reunification therapist, in concert with the state, deprived Russel and his children of constitutional rights.

After service of the *Initial Complaint* on April 3, 2024, district dismissal of the *Complaint* on September 13, 2024, and December 9, 2024—when the Fourth Circuit affirmed dismissal—no State actor could plausibly claim ignorance of the claims. Liability attaches where policymakers are aware of and acquiesce in

unconstitutional practices. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

**2 - Deliberate Indifference**

Instead of remedying the misconduct, Utah officials allowed conflicted judges, discredited witnesses, and coercive orders to persist, demonstrating deliberate indifference. *see Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Following formal notice of the *Initial Complaint*, the State's conduct evolved from passive neglect to active retaliation. The biased conduct has been ongoing and Russel, Kirk and Shawnee Marsh, and children face prospective damages:

**3 - Judicial Bias, Manipulation and Conflict of Interest**

Judge Edwards - in full knowledge of active litigation against him alleging bias, lack of jurisdiction, and negligence - accepted appointment to the Utah Judicial Conduct Commission; then, in the federally litigated state case, refused recusal and dismissed Russel's *Petition to Modify Child Support* on a self-serving procedural pretext ("failure to serve the defendant [himself]"). (*see Exhibit 15 - notice of service; Exhibit 16 - tab 2 p. 1 - JCC minutes; Exhibit 20 - court order dismissing Petition)*

**4 - Joinder of Federal to State Case Leading to Procedural Contamination**

Defendant Judge Michael Edwards filed federal filings into the state divorce docket, presumably acknowledging the allegations and enjoining federal allegations to the state case. However, rather than address the violations, the state then ignored the allegations and violations, forgoing any ability to adjudicate within the state (*see Exhibit 1 - state court docket; Exhibit 20 - court order dismissing Petition).*

Between October 2024 and October 2025, the state court imported Russel's dismissed federal pleadings into the adversarial divorce docket, converting constitutional filings into evidence against him *(see Exhibit 1 - state court docket).* This motion presents a new federal injury—the conversion of dismissed federal pleadings into evidence for state contempt—constituting independent deprivation under § 1983.

**5 - Witness Tampering and Administrative Interference**

During the pendency of this *Complaint,* the State of Utah declined Russel's request to investigate Emmons; concurrently in federal filings, Defendants State of Utah and Edwards denied responsibility or collusion with Emmons, yet communicated with, and suspended the professional license of Emmons for violations unrelated to Russel (*see Exhibit 17 - email denial of investigation request; Exhibit 18 para. 7 - Emmons disciplined actions).*

In October 2024 the Utah Department of Professional Licensing erased, then restored, the disciplinary record of therapist Dana Emmons — timed to obstruct litigation. (*see Exhibits 24; 25)*

**6 - Retaliatory Enforcement**

Lauren Zimmer is repeatedly permitted to pursue incarceration motions despite contradictory exhibits and pending modification petitions. (*see Exhibits 2; 3; 5; 6; 8; 10; 11; 12; 13; 14; 21; 28)*

**7- Ecclesiastical Entanglement**

Despite presumed knowledge of allegations that he biased the state divorce court, Bishop W. Christopher Waddell participated in May 2025 hearings, seeming to confirm continuing religious influence over secular proceedings.

**8 - No State Attempts at Restitution or Redress of Due Process**

Despite notice from Russel in both federal and state forums, Defendants continue to enforce an unconstitutional judgment, having not only failed to remedy the entrapping orders, but facilitating and supporting ongoing and prospective abuses.

**9 - Ongoing Obligations of Third Parties and Further Prospective Third-Party Sanctions**

Kirk and Shawnee Marsh have not been afforded severance from orders unconstitutionally leveled against them. (*see Exhibit 10 paras. 10, 16, 18; Exhibit 11 - paras. child support, insurance premiums, medical expenses; Exhibit 26 p. 5 para 21, p. 13 para. 10; Exhibit 27 para. 3)*

Lauren now requests sanctions against a third-party Instagram account; as the court has previously sanctioned third parties, it is reasonable to assert that additional third parties, such as the owner of the Instagram account, face prospective sanctions in violation of due process and freedom of speech. (*see Exhibit 11 para. Mutual Restraining Order)*

**10 - Bad-Faith Retaliation**

Courts have long held that when state officials, after notice of constitutional wrongdoing, intensify rather than correct it, their conduct constitutes bad-faith retaliation under color of law. *Mitchum v. Foster*, 407 U.S. 225, 242 (1972); *Owen v. City of Independence*, 445 U.S. 622, 650 (1980).

## IV. STRUCTURAL UNDERMINING OF THE FEDERAL ACTION LEADING TO ONGOING HARM

From the filing of the complaint, the proceedings were undermined by overlapping conflicts of interest and retaliatory maneuvers; these actions render the state forum prospectively inadequate:

**11 - Judicial Oversight Conflict (Edwards' Appointment to JCC)**

During the pendency of this federal action, Defendant Judge Michael Edwards—who presided over Russel's underlying state proceedings—was appointed to the Utah Judicial Conduct Commission ("JCC"), the state's sole body empowered to investigate and discipline members of the judiciary for misconduct.

On April 3, 2024, Judge Edwards was served with the Initial Complaint in this matter *(see Exhibit 15 - certificate of service)*. Less than two weeks later, on April 16, 2024, he was sworn in as a sitting member of the JCC *(see Exhibit 16 tab 2 p. 1 - notes from JCC meeting)*. This appointment created an inherent structural conflict: any subsequent allegations of judicial misconduct arising from Russel's case will be reviewed—directly or indirectly—by the very judge accused of bias.

Such a dual role foreclosed impartial oversight at the state level and violated the fundamental requirement of a neutral adjudicator. See *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009) (holding that due process is violated where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable"); see also *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (recusal required where structural entanglements create a possible temptation for bias). The appointment of a sitting respondent judge to the body charged with judicial discipline deprived Russel of any meaningful or impartial avenue for redress within the state system.

**12 - Administrative Retaliation (DOPL)**

Russel raised formal concerns to the Utah Department of Professional Licensing ("DOPL") regarding misconduct by court-appointed therapist Dana Emmons, whose involvement in the underlying custody proceedings included control over his parent-time and reunification efforts.

On July 25, 2024, the DOPL refused to investigate Russel's complaint, citing the pendency of litigation *(see Exhibit 17 - correspondence re. Russel's investigation request).* On August 2, 2024, the same agency revoked Emmons' professional license on unrelated grounds—confirming that DOPL was both aware of Emmons' misconduct and fully capable of disciplining her, but deliberately insulated the specific issues raised by Russel *(see Exhibit 18 - discipline order para 7).* This selective enforcement demonstrates administrative retaliation and protectionism, shielding an adverse witness while preserving her credibility against Russel in state proceedings.

**13 - Erasure and Reinstatement of Disciplinary Records (DOPL)**

The district court dismissed Russel's complaint on September 13, 2024; on October 7, 2024, the DOPL removed the public record of therapist Dana Emmons' disciplinary action from its website, effectively erasing evidence of misconduct

and preserving her credibility as a witness adverse to Russel *(see Exhibit 24 - historical DOPL records 10/7/2024).*

On October 31, 2024 (after Russel filed his federal appeal on October 10), DOPL restored the record *(see Exhibit 25 - historical DOPL record 10/31/2024)*, confirming that the removal was not a technical error but a discretionary act timed to obstruct Russel's litigation.

This manipulation of the administrative record demonstrates state complicity in shielding a discredited witness and further illustrates why Utah's forum cannot provide impartial redress. *See Banks v. Dretke*, 540 U.S. 668, 675–76 (2004) ("A rule declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

**14 - The State of Utah's Relationship and Asserted Collusion with Dana Emmons**

Despite the State's repeated representations that it acted independently of therapist Dana Emmons, the record demonstrates coordinated conduct designed to shield both the State and Emmons from accountability. Emmons actively evaded service of the *Initial Complaint*: certified mail was twice returned or refused, she vacated all known business and residential addresses, and left no forwarding information. During this same period, however, the Utah Department of

Professional Licensing ("DOPL") remained in communication with Emmons concerning disciplinary action on her professional license. Thus, while the State publicly disclaimed association with Emmons, it was simultaneously in active concert with her in matters directly connected to this litigation.

This conduct establishes constructive agency and collusion between the State and its purportedly "independent" witness. When a government entity "joins or cooperates with private parties to deprive a person of constitutional rights," it acts under color of state law within the meaning of 42 U.S.C. § 1983. *See Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). Here, DOPL's contemporaneous coordination with Emmons—while she evaded service and continued influencing related state proceedings—demonstrates joint participation in obstructing federal process.

Moreover, the State's decision to discipline Emmons only on unrelated grounds, while insulating the misconduct relevant to Russel's case, constitutes selective enforcement in violation of equal protection principles. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) (equal protection violated when the law is applied "with an evil eye and an unequal hand"); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (retaliatory enforcement actionable where protected activity is the but-

for cause). These circumstances reveal extraordinary bad faith and collusion by the State, rendering the prior judgment unreliable.

**15 - Reliance Upon a Compromised Authority**

As per her *Motion to Enforce and Order for Sanctions*, Lauren now asks for sanctions, including that Russel again be subjected to the judicially appointed control of a reunification counselor over parent time. Lauren cites Dana Emmons as a credible source for her demands, despite the state's documented suspension of Emmons' license - Lauren now quotes Emmons' letter to attorneys and the court involving Russel's claims of medical privacy violations, child abuse in Lauren's home, and allegations that Russel lied *(see Exhibit 2 para. 20 - request for reunification therapy; Exhibit 10 para 45 - citing Emmons authority).*

This conduct constitutes fraud upon the court, as defined in *United States v. Throckmorton*, 98 U.S. 61, 65 (1878), by presenting discredited testimony from a witness whom the State itself had found unfit to practice. The State's dual posture—publicly disciplining Emmons for unethical conduct while continuing to rely on her statements against Russel—reflects deliberate administrative retaliation and collusion to preserve a false narrative.

**V. PROCEDURAL MANIPULATION AND**

**THREAT OF IMMINENT INCARCERATION**

**16 - Edwards' Sworn Representations Contradict His Subsequent Orders**

On May 27, 2024, in pleadings filed in this § 1983 action, Defendant Judge Michael Edwards expressly represented to this Court that the Utah state forum provided an adequate vehicle for Russel's constitutional claims. Edwards stated:

> "This state proceeding affords adequate opportunity to raise the issues Marsh brings. Marsh is concerned about the amount of child support he has been ordered to pay — a petition to modify the child support order would address these concerns and is the appropriate avenue by which to remedy these concerns. This state proceeding would also provide vehicles for Marsh's constitutional claims to be heard" *(see Exhibit 19 - defendants reply to motion to dismiss).*

Less than three months later, on August 13, 2024, Judge Edwards—sitting in his state-court capacity—dismissed Russel's *Petition to Modify Child Support* for "failure to serve the defendant (Russel)" *(see Exhibit 20 - court order).* This impossible standard required Russel to "serve" himself, rendering compliance unattainable and ensuring dismissal rather than adjudication.

The action directly contradicts Edwards' sworn federal representations and demonstrates a deliberate manipulation of procedural rules to foreclose review. As the Supreme Court cautioned in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009), due process is violated where "the probability of actual bias … is too

high to be constitutionally tolerable." Transforming service requirements into a self-defeating procedural barrier constitutes precisely such bias. It mirrors the type of judicial self-interest condemned in *In re Murchison*, 349 U.S. 133, 136 (1955), where the Court held that "no man can be a judge in his own case" and warned that structural entanglements erode impartiality.

By dismissing the very petition he identified as the "appropriate avenue" for relief, Judge Edwards not only nullified his federal assurances but also converted procedural formality into a barrier to constitutional redress.

**17 - Imminent Deprivation Contradicts Defendants' Prior Representations**

Assertions made by Defendants State of Utah and Judge Edwards in their May 20, 2024 federal filings are no longer true. In those filings, Defendants argued that Russel's claim of potential incarceration was "a mere speculative possibility of confinement" and therefore insufficient to invoke federal jurisdiction *(see Exhibit 19 paras. 4, 5 - defendants' motion to dismiss).*

Since that time, Russel has faced imminent incarceration under the very enforcement proceedings Defendants dismissed as hypothetical. This post-judgment escalation converts what Defendants described as a theoretical restraint into an immediate deprivation of liberty. Under *Hensley v. Municipal Court*, 411 U.S. 345 (1973), habeas relief is available even before physical custody begins

when "the petitioner is subject to restraints not shared by the public generally." The same reasoning applies here: the ongoing threat of incarceration—combined with repeated procedural manipulation—constitutes the threshold for habeas relief.

**18 - Structural Collapse and the Weaponization of Federal Filings**

On October 15, 2024, Judge Michael Edwards sua sponte entered Russel's pending federal appeal into the state divorce docket, collapsing the procedural boundaries between two independent jurisdictions *(see Exhibit 1 - docket record).* The court electronically notified Lauren and her counsel but failed to notify Russel himself, depriving him of notice and the opportunity to object *(see Exhibit 22 - notice of service).* This selective disclosure violated fundamental due process and signaled that the court had adopted the federal record as an adversarial instrument rather than a neutral filing. By merging the federal appeal into ongoing domestic proceedings, the court contaminated the divorce docket with materials intended for a separate judicial forum. Russel's constitutional pleadings—filed to vindicate federal rights—were repurposed as evidence against him in a hostile venue.

This exceeded the permissible scope of judicial notice and created structural entanglement between state and federal systems, precisely the type of overlap condemned in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009), which held that even the probability of bias is "too high to be constitutionally

tolerable." It also implicates *Tumey v. Ohio*, 273 U.S. 510 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), where systemic arrangements creating a "possible temptation" for bias were deemed unconstitutional.

This fusion of forums reframed Russel's efforts to vindicate his federal rights as antagonistic to the state process, weaponizing his pleadings and contaminating the docket. The court's conduct undermined adjudicative neutrality and invited institutional bias. The continued use of Russel's federal filings within an adversarial state docket underscores the collapse of judicial impartiality and the inadequacy of the state forum.

**19 - Notice and Ecclesiastical Entanglement**

Further compounding the appearance of bias, Judge Edwards' notification of Lauren—while excluding Russel—coincided with Russel's allegations of ecclesiastical entanglement. His appeal uniquely identified the court's reliance on religious authority, including directives from W. Christopher Waddell of the Presiding Bishopric of the Church of Jesus Christ of Latter-Day Saints, whose testimony was treated as fact evidence in support of his daughter (*see Exhibit 23 - Biographical Information re. church news article regarding Waddell's family),* in violation of constitutional safeguards.

This collapse of jurisdictional boundaries and judicial neutrality set the stage for subsequent abuses—financial, procedural, and constitutional—that now threaten Russel's liberty.

The contamination of the state docket with federal filings—absent procedural safeguards—created an intolerable risk of partiality. It transformed neutral pleadings into adversarial tools, collapsed jurisdictional boundaries, and invited religious influence into a secular forum.

Waddell's subsequent presence, despite knowledge of Russel's allegations of bias and collusion, in state court proceedings on May 12, 2025 reinforced the perception of institutional bias and further chill Russel's access to redress.

**20 - Bad-Faith Filings and Procedural Misrepresentation by Opposing Counsel**

The pattern of procedural manipulation extends beyond the bench to Lauren's counsel, whose filings demonstrate material misrepresentation for truth and due process. On February 25, 2025, Lauren's attorneys filed an *Objection to Objection to Request to Submit on Ex Parte Motion to Stay*, misrepresenting material facts regarding the timing and status of Russel's filings. As shown in *Exhibit 21*, counsel asserted that "at the filing of this present Objection, Russel had

not paid the required filing fee and the Court indicated that they could not file the *Petition to Modify* until he had done so.

This assertion was demonstrably false. The MyCase docket shows that Russel's *Petition to Modify Child Support* was electronically filed and accepted by the court on February 25, 2025 — before Lauren's objection was entered *(see Exhibit 21 - showing Petition to Modify filed 2/25/25 and payment of $200 fee recorded).* Counsel's filing therefore misrepresented the record and falsely implied ex parte communication with the court ("the Court indicated …") to justify opposition. Such conduct constitutes a violation of the duty of candor toward the tribunal under Utah R. Prof. Cond. 3.3(a)(1) and has long been recognized as grounds for sanctions when used to obtain tactical advantage. See *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (court may sanction counsel for "bad-faith conduct in litigation" that multiplies proceedings or misleads the court).

The deliberate submission of false procedural representations wasted judicial resources, delayed resolution of pending motions, and further deprived Russel of fair process. The February 26 filing exemplifies how opposing counsel's misstatements—left uncorrected by the court—converted procedural safeguards into instruments of harassment and delay, reinforcing the need for federal review.

The state court's failure to acknowledge or correct these continuing violations—despite explicit notice through the record—reflects institutional bias and deliberate indifference rather than inadvertent error. When a court knowingly allows false procedural assertions to stand unaddressed, it becomes complicit in the deprivation of due process.

## VI. FACTUAL BACKGROUND AND POST JUDGMENT FILINGS

### 21 - Filings

On September 13, 2024, this Court dismissed Russel's §1983 complaint on jurisdictional grounds. On October 10, 2024, Russel filed *Informal Brief for Habeas Cases* in the Fourth Circuit Appellate Court. On October 15, 2024, federal Defendant Judge Michael Edwards entered Russel's *Informal Brief for Habeas Cases* into the State Divorce Docket *(see Exhibit 1),* and served notice to Lauren Zimmer (fka Marsh) *(see Exhibit 22).* On December 9, 2024, the Fourth Circuit Court of Appeals affirmed dismissal of the §1983 complaint on jurisdictional grounds.

On December 17, 2024, in the state action, Lauren filed a *Motion to Enforce and for Sanctions*, seeking Russel's imprisonment for alleged violations of the entrapping state divorce decree *see Exhibit 2 - Motion to Enforce).* On February 12, 2025, Lauren motioned *Motion to Waive Mediation Requirements* seeking final say on all parenting decisions *(see Exhibit 5).*

**22 - Parental Alienation through Abuse of Judicial Process**

On December 28, 2024, Lauren caused a constable to serve enforcement papers on Russel at his cousin Jared's Utah residence, where Russel was exercising court-ordered visitation with his children. In her January 13, 2025 affidavit of service, Lauren's attorney confirmed that Lauren knew the children would be present at the time of service *(see Exhibit 3 para. 2).*

This appears to be an attempt to alienate the children from their father, as the children were present for Russel's federal arrest in 2017; further witness of police action against Russel is not in the best interest of the children.

On March 3, 2025, Lauren further clarified her intent to Jared's wife, Candice, stating that she had the papers sent to Candice's home so Candice would read them; Lauren stated Candice's support "facilitated Russel's abuse of Lauren" and expressed her desire that Candice withdraw her home as a site for parent time. Lauren then sent Candice her *Motion to Enforce* and *Memorandum*, not as a neutral legal filing, but as a targeted instrument of pressure and reputational harm *(see Exhibit 4 - phone call and texts between Lauren and Candice).*

This pattern reflects a misuse of judicial process for retaliatory and alienating purposes. The deliberate exposure of children to police action, coupled with the weaponization of filings to isolate a third-party witness, constitutes such

circumstances. Courts have long held that "abuse of process" occurs when legal procedures are used "to accomplish a purpose for which they were not designed" (*Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994)). Here, the enforcement mechanism was not used to secure compliance, but to inflict reputational and relational harm.

**23 - False and Retaliatory Claims**

On February 18, 2025 Lauren filed *Petition to Modify Decree of Divorce* seeking to strip Russel of all legal custody *(see Exhibit 6 para. 11)*, resting on allegations that are not only unsupported, but directly contradicted by her own exhibits. Courts have consistently held that credibility and consistency are essential in custody determinations (*T.H.*, 913 N.W.2d at 578), and that misuse of judicial process through false or retaliatory claims may warrant denial of modification (*Melville*, 18 P.3d at 570). Where a parent withholds medical care or manipulates facts to gain advantage, courts must intervene to protect the child's welfare (*H.S.H.-K.*, 533 N.W.2d at 419). Lauren's conduct—misrepresenting therapy access and oral surgery timing—reflects a pattern of behavior that undermines the child's best interests and the integrity of the proceedings.

In this filing Lauren claims, “due to Father’s failure to maintain his financial obligations, the parties’ minor child was unable to continue to receive therapy” *(see Exhibit 10, para 21).* Russel refuted,

> “Because in 2024 Kirk was no longer paying Lauren, Lauren told the new practice the Court ordered consent and direct payment from both parents. The practice emailed Russel consent forms and financial obligations forms on or about July 1, 2024. On or about July 30, 2024, Russel called the practice to confirm their need for payment directly from him. The practice told him: “As the practice’s own documents state, the parent who initially sets up counseling for the child is considered the guarantor. This means that the parent is considered financially responsible for covering the cost of services and communicating cost and reimbursement with the other parent.”

The practice sent Russel a new consent form, omitting the financial obligation form, which Russel signed on July 30, 2024” *(see Exhibit 7 para. 3).*

Rather than pay, Lauren chose to withhold therapy from the minor child *(see Exhibit 7 para. 3).* Additionally, Lauren claims,

> “In March 2023, the parties’oldest child required oral surgery to remove 4 impacted wisdom teeth…as the minor child was experiencing pain from the impacted wisdom teeth, Mother finally moved forward with the operation

> without Father's input. Further damage to the minor child would have developed if Mother did not choose to move forward. Father's refusal to respond resulted in the minor child experiencing oral pain for an additional five months" *(see Exhibit 6 p. 4 - Petition).*

In her own exhibits related to the above action, Lauren contradicts herself; she includes emails which state,

> "The orthodontist noted that NRM's X-Rays now show all four wisdom teeth and her bottom wisdom teeth are blocking her 12-year-old molars from coming in… It is an exceptionally busy time of the year with the end of school and spring sports, so I asked if we could wait a few months and do it over the summer. The doctor was fully supportive of that and we went ahead and made an appointment for Monday, July 10th for all the extractions" *(see Exhibit 8 - emails dated March 8, 2023 and April 21, 2023).*

**24 - Prejudice: Escalation Toward Incarceration and Retaliatory Enforcement**

On March 12, 2025, during a hearing on *Motion to Enforce and for Sanctions*, the state-court commissioner stated her understanding that Russel needs to pay the ordered support and arrears need to be collected. The commissioner set a

new hearing for May 12, 2025, explicitly declaring that "no continuances will be allowed" *(see Exhibit 9 - court order).*

Russel had moved for a stay of enforcement pending his *Petition to Modify Child Support* (filed February 24, 2025), but the court declined to rule on or grant the stay. Despite the commissioner's express declaration that there would be "no more continuances" of Lauren's *Motion to Enforce* (*see Exhibit 9 - court order),* the court repeatedly granted delays under circumstances that raise serious concerns about procedural integrity (continuances were granted to Lauren on May 12, 2024, and July 14, 2024). While trial courts retain discretion over continuances (*Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)), that discretion is not unlimited. As the Ninth Circuit held, "a trial court abuses its discretion when it acts arbitrarily or fails to consider relevant factors" (*Gallo v. U.S. Dist. Court*, 349 F.3d 1169, 1178 (9th Cir. 2003)).

Repeated delays—especially after a declared cutoff—prejudiced Russel's ability to respond and eroded the reliability of the proceedings. Courts have recognized that "repeated continuances can prejudice the opposing party and undermine the integrity of the proceedings" (*In re Marriage of Hoff*, 766 N.W.2d 271, 276 (Minn. Ct. App. 2009)).

On July 14, 2025, counsel for Lauren introduced into state-court proceedings the Russel's previously dismissed federal § 1983 complaint and argued that its filing created a conflict of interest warranting transfer (*See Exhibit 30 para. 1 - order on hearing)*. The commissioner expressly rejected that premise, finding that "the Court does not find that a transfer of venue would increase the likelihood of a fair and impartial determination. The Court finds that both courts have the ability to make a fair and impartial determination of the action." Nevertheless, venue was subsequently transferred over Russel's objection — not for reasons of impartiality, but "to minimize the expense or inconvenience to the parties where [Lauren] now lives in Utah County."

This sequence presents both a due-process irregularity and a federal–state comity problem:

1. **Improper use of a federal pleading in a state forum.**

   A dismissed federal civil-rights complaint is not evidence; it is a legal assertion protected by the right to petition under the First Amendment. Its introduction as substantive argument in a separate state proceeding constitutes a misuse of federal filings that risks penalizing the exercise of federal remedial rights. See *California Motor Transport Co. v. Truckers Union*, 404 U.S. 508, 510–11 (1972) (petitioning immunity); *BE & K*

*Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (right to pursue non-frivolous litigation).

2. **Chilling effect on access to federal remedies.**

When the state court allowed argument premised on the mere act of filing a § 1983 complaint, it created a precedent by which a litigant's resort to federal process could be re-characterized as misconduct. That outcome undermines Congress's intent that § 1983 provide an *independent* avenue for constitutional redress, untainted by state reprisal. See *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

3. **Inconsistent judicial rationale.**

The commissioner's oral ruling denied that fairness required transfer, yet the written order effectuated one. The shift from a fairness rationale to a convenience rationale suggests an *appearance* of deference to the very conflict allegation the court had disavowed. Even if well-intentioned, that inconsistency contributes to the "structural bias" pattern documented elsewhere in this motion. Cf. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (appearance of partiality sufficient to undermine confidence in proceedings).

4. **Resulting constitutional prejudice.**

By permitting an opposing party to weaponize a dismissed federal complaint, the state forum indirectly punished protected petitioning activity and distorted the neutral administration of venue statutes. The effect was to convert a federal dismissal into an instrument of state-level retaliation, a result incompatible with both the Supremacy Clause and the principle of comity.

Accordingly, this episode constitutes an additional extraordinary circumstance justifying relief under Rule 60(b)(6): the misuse of a federal pleading in a collateral state proceeding not only chilled the plaintiff's right of access to federal courts but also produced an inconsistent state-court record whose reasoning cannot be reconciled with constitutional neutrality.

**26 - Imminent Incarceration and Loss of Parental Rights**

Russel faces imminent incarceration pursuant to Lauren's *Motion to Enforce* hearing scheduled November 12, 2025 *(see Exhibit 10 para. 74).* Habeas corpus is a proper and timely remedy under these circumstances. As the Supreme Court held in *Hensley v. Municipal Court*, 411 U.S. 345 (1973), habeas relief is available even before physical custody begins, where "the petitioner is subject to restraints not shared by the public generally" and incarceration is imminent. The threat of imprisonment—especially when rooted in contested or retaliatory

enforcement—triggers the protective scope of habeas corpus. Courts have consistently recognized that the writ is designed to prevent unlawful detention, not merely to remedy it after the fact (*Preiser*, 411 U.S. at 484; *Zadvydas*, 533 U.S. at 678).

In addition to the threat of imprisonment, Russel faces imminent deprivation of legal custody pursuant to Lauren's pending *Petition to Modify*, which seeks to terminate his legal custody over the minor children. The combination of threatened incarceration and impending loss of legal parental custody rights constitutes a dual liberty deprivation of the highest constitutional order.

**27 - Multipronged Threat of Incarceration Beyond Financial Allegations**

Lauren's request for Russel's incarceration is not limited to financial enforcement *(see Exhibit 10 para. 74 - Declaration; Exhibit 11 para. 6 - Reply).* She seeks imprisonment on multiple grounds, including speculative allegations tied to a third-party Instagram account—claims that implicate expressive conduct and fall wholly outside the scope of traditional contempt proceedings.

The State's prior willingness to impose obligations on third parties in this case makes this expansion especially concerning, as it suggests a pattern of punitive overreach extending beyond lawful jurisdiction. This multipronged threat converts what should be a civil enforcement hearing into a punitive forum

untethered from statutory authority. The breadth of Lauren's request—spanning disputed financial claims and unsubstantiated digital associations—constitutes an abuse of process, defined as "the use of legal procedure to accomplish a purpose for which it was not designed" *Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994).

**28 - The Right to Free Speech**

Moreover, the threat of incarceration based on third-party speech raises constitutional concerns. Courts have held that expressive activity—even when controversial—is protected unless it meets strict standards for incitement or direct harm (*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)). To seek imprisonment based on an Instagram account not operated by Russel, without clear evidence of control or contemptuous conduct, is not merely overreach—it is retaliatory and constitutionally suspect.

## VII. FINANCIAL ENTRAPMENT AND FRAUD

**29 - Concealment and Undervaluation of Marital Assets**

On December 9, 2024, Lauren transferred multimillion-dollar marital property into her husband's name and then conveyed it to a third-party trust for $10 *(see Exhibit 12- property records).* This sequence—executed before commencing litigation—raises serious concerns about fraudulent conveyance, asset shielding, and contempt of equitable disclosure obligations.

The transfer for nominal consideration suggests intentional undervaluation and evasion. As the Supreme Court recognized in *United States v. Estate of Romani*, 523 U.S. 517, 533 (1998), "[a] conveyance for grossly inadequate consideration may be evidence of actual intent to hinder, delay, or defraud creditors." Moreover, in *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 (1994), the Court emphasized that transfers below market value—especially in non-arm's-length transactions—invite scrutiny under fraudulent conveyance doctrines. Lauren's actions not only distort the financial landscape of the case but also obstruct Russel's access to equitable remedies.

**30 - Punishing Parent-Time as Financial Misconduct**

On December 17, 2024, Lauren argued that Russel's exercise of parent-time constituted willful noncompliance with child support obligations. She cited his monthly flights from Virginia to Utah—costing $500–$750 per trip—as evidence that he had the financial means to pay support but chose instead to prioritize visitation *(see Exhibit 10, para 71).* This framing treats court-ordered parent-time not as a right or obligation, but as a discretionary luxury subject to penalty. Courts have consistently held that a parent's effort to maintain a relationship with their child must not be construed as financial misconduct. *In Maldonado v. Maldonado*, 789 A.2d 1142, 1146 (Md. Ct. Spec. App. 2002), the court rejected the notion that

travel expenses incurred to exercise visitation could be used to prove bad faith or noncompliance, emphasizing that "parental access is a right, not a privilege contingent on financial surplus."

Moreover, penalizing Russel's travel for visitation undermines the child's best interests and risks chilling lawful parent-time. As the Supreme Court recognized in *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), "the integrity of the family unit has found protection in the Due Process Clause."

**31 - Financial Fraud Regarding Children's Expenses**

On March 16, 2025, in preparing for the March 17 *Motion to Enforce* hearing, Russel reviewed Lauren's submitted exhibits; Russel found that between January 2020 and December 2023, Lauren overcharged Kirk and Shawnee Marsh thousands of dollars for her family's medical insurance premiums *(see Exhibit 10 para. 16 stating Russel owes $120/month; Exhibit 13 showing Russel owes $235.63; Exhibit 28 showing Russel owes $235).* The precise calculation of insurance premiums is a factual dispute reserved for evidentiary hearing; what matters here is that Lauren's prior representations regarding premium structure and added dependents are inconsistent with her own written communications, underscoring the credibility concerns central to this motion. As this was discovered in post-judgment litigation, it could not have been known during the pendency of

this federal complaint. This overcharging occurred across state lines and contradicts Lauren's own statements—documented in her notes—that Russel owed only $120 per month. The discrepancy suggests intentional inflation of financial obligations and misrepresentation of Russel's role, as provided by Kirk and Shawnee, in covering insurance costs.

These contradictions, embedded within Lauren's own filings, may constitute fraud on the court (*United States v. Throckmorton*, 98 U.S. 61, 65 (1878)). The harm is not merely procedural—it is financial, reputational, and constitutional, as third parties were compelled to pay inflated amounts without judicial oversight or recourse. Here, the concealment and misrepresentation of financial obligations—paired with the absence of a forum for Kirk and Shawnee—warrants judicial correction.

**32 - Material Misrepresentations or Omissions**

On April 5, 2025, pursuant to court order, Lauren submitted an updated financial disclosure to Russel *(see Exhibit 14).* The disclosure was substantively blank—omitting all household expenses and failing to provide any documentation necessary to assess financial need. Lauren stated, "I have no personal income. My tax returns reflect my husband's income which is not relevant to this modification case," and marked all financial categories as "doesn't apply." This submission

violates the purpose of court-ordered financial disclosures, which exist to ensure transparency, facilitate equitable determinations, and prevent concealment. *In re Marriage of Riddle*, 125 Cal. Rptr. 2d 642, 649 (Cal. Ct. App. 2002), the court emphasized that "failure to disclose material financial information in a dissolution proceeding is grounds for setting aside orders based on that disclosure."

## VIII. KIRK AND SHAWNEE MARSH — THIRD-PARTY FINANCIAL BURDEN AND CONTINUING CONSTITUTIONAL VIOLATIONS

Russel's travel to and from Utah for court-ordered parent-time is funded entirely by Kirk and Shawnee Marsh, pursuant to judicial orders requiring them to cover all travel expenses *(see Exhibit 26 p. 5 para. 21, p. 13 para. 10).* Yet Kirk and Shawnee—neither parties to the underlying custody action nor beneficiaries of its outcome—have no forum within the state system to challenge or seek redress for this obligation. This arrangement imposes a continuing financial burden on third parties without affording them procedural safeguards or standing to contest the order. As the Supreme Court held in *Hansberry v. Lee*, 311 U.S. 32, 40 (1940), "it is a violation of due process for a judgment to bind one who was not a party to the litigation."

Moreover, the compelled subsidization of another's constitutional rights—without notice, hearing, or opportunity to be heard—raises structural concerns under the Due Process Clause. Courts have recognized that extraordinary

circumstances under Rule 60(b)(6) include "situations where the judgment works an extreme and undue hardship." *Ackermann v. United States*, 340 U.S. 193, 202 (1950). Here, the hardship is not merely financial—it is jurisdictional and procedural, depriving Kirk and Shawnee of any avenue to assert their rights or challenge the ongoing imposition. This ongoing constitutional effect will prospectively harm without federal intervention.

**33 - Derivative Constitutional Injury and Structural Omission**

During the course of these § 1983 proceedings, Kirk and Shawnee Marsh sought to be enjoined or joined as parties due to their direct financial entrapment under state orders *(see Exhibit 27 - brief of Kirk Marsh).* The district court never ruled on these requests, leaving their constitutional claims unaddressed and unresolved. The omission is not procedural but structural. Defendants themselves argued that Kirk and Shawnee's claims were "*inextricably intertwined*" with those of Russel, and this Court adopted that characterization in its order of dismissal. Having accepted that representation, the Court cannot now separate Russel's constitutional injuries from those of his co-plaintiffs.

To leave judgment standing under these circumstances is to perpetuate violations against all three parties: by failing to distinguish between individual and derivative claims—and by dismissing the action in its entirety as "*inextricably*

*intertwined*"—the district and appellate courts have, in effect, already enjoined Kirk and Shawnee to the complaint. Their financial obligations under the state's continuing orders remain binding and coercive, enforced under threat of contempt, yet without any federal forum in which to assert due process and equal protection claims arising from those same orders. This outcome contravenes the principle that courts must "*provide a forum for redress of constitutional wrongs, not close the courthouse doors on technicalities.*" *See Monroe v. Pape*, 365 U.S. 167, 180 (1961); *Allen v. McCurry*, 449 U.S. 90, 96 (1980).

**34 - Continuing Violations of Property and Due Process Rights**

On December 17, 2024, Lauren paradoxically misapplied the of compliance of Kirk and Shawnee to allege that Russel's travel for parent-time constituted proof of "willful noncompliance" with child-support obligations—distorting lawful family interaction into purported evidence of contempt *(see Exhibit 10 para. 71).*

**35 - No Forum for Redress of Fraud**

Between January 2020 and December 2023, Lauren's misrepresentation of medical-insurance expenses caused Kirk and Shawnee Marsh to overpay thousands of dollars toward premiums *(see Exhibit 10 paras. 10, 16, 18; Exhibit 11 - paras. child support, insurance premiums, medical expenses).* Despite these payments, Kirk and Shawnee lack standing in state court to recover or contest the

overcharges, leaving their property seized without due process or lawful adjudication.

**36 - Ongoing Violations**

These acts constitute an ongoing violation of the Fourth Amendment, through unlawful seizure of property, and the Fourteenth Amendment, through denial of procedural and substantive due process. *See Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (Fourth Amendment protects against unlawful seizure of property under color of law); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (due process requires notice and opportunity to be heard before deprivation of property). The continued enforcement of these orders, while simultaneously denying access to any forum for redress, transforms ordinary error into systemic constitutional violation. As in *Papasan v. Allain*, 478 U.S. 265, 275 (1986), the ongoing nature of the deprivation constitutes a continuing violation of constitutional rights. Their continued subjection to orders without party status further illustrates the extraordinary and continuing nature of the deprivation.

## IX. ARGUMENT

**37 - Cumulative Structural Undermining and Extraordinary Circumstances Warranting Relief**

Taken together, the record reveals a sustained pattern of structural breakdown — judicial oversight conflict, administrative retaliation, procedural

obstruction, bad-faith filings, docket contamination, and reliance on a discredited state witness — all converging to destroy the appearance and reality of impartial adjudication. These are not isolated errors; they represent an institutional failure of neutrality and accountability that strikes at the core of due process itself.

Each event documented herein could independently justify extraordinary relief; together, they form an inescapable mosaic of bias and retaliation that deprived Russel of fair process in both state and federal forums. As the Supreme Court observed, "tampering with the administration of justice ... involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). The facts presented here demonstrate precisely such tampering and compel this Court's intervention to restore integrity to its prior judgment.

Relief under Rule 60(b)(6) is available only in "extraordinary circumstances" that render enforcement of a judgment manifestly unjust. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). Such circumstances are plainly present. The State's continuing conduct — judicial conflicts, administrative manipulation, financial coercion, and ecclesiastical pressure — renders the prior judgment inequitable. Each step, from forum contamination to

selective enforcement, has foreclosed impartial redress. Russel now faces imminent incarceration, deprivation of parental rights, and seizure of property, all arising from proceedings tainted by conflict of interest and institutional interference. These developments, combined with the State's misuse of his dismissed federal pleadings in the adversarial state docket, constitute the type of post-judgment conditions that "render enforcement inequitable" *Gonzalez v. Crosby*, 545 U.S. 524, 536 (2005).

Accordingly, this Court possesses both the authority and the duty to reopen the judgment under Rule 60(b)(6) and vacate prior orders entered under the shadow of structural impropriety.

**38 - Manifest Injustice Will Result if the Judgment Stands**

Leaving the prior judgment in place would produce manifest injustice. Dismissal of this action has left Plaintiffs without any forum—state or federal—in which to vindicate their constitutional rights. Defendants themselves argued that the state forum was adequate to hear those claims; yet subsequent proceedings have proven the opposite. The state tribunal has demonstrated procedural bias, selective enforcement, and retaliatory action after notice. Relief is warranted because the State's conduct, after explicit notice, transformed this matter from jurisdictional dismissal to a continuing deprivation of liberty and property.

Denying reopening would ratify ongoing violations and erode public confidence in the rule of law. Where continued enforcement of judgment would "sanction injustice or further deprivation of rights," vacatur is appropriate. *See Klapprott v. United States*, 335 U.S. 601, 614–15 (1949) (Rule 60(b)(6) relief proper when circumstances make enforcement "manifestly unjust").

**39 - Relief is Warranted Under Rule 60(b)(6)**

This Court retains inherent discretion to vacate its prior dismissal where post-judgment developments undermine the fairness of leaving that judgment in place. *See Ackermann v. United States*, 340 U.S. 193, 199 (1950); *Liljeberg*, 486 U.S. at 864. The cumulative record here—including judicial oversight conflicts, administrative retaliation, bad-faith filings, and post-notice retaliation—demonstrates a breakdown of the state forum's neutrality and continuing deprivation of federal rights. Rule 60(b)(6) is designed precisely for such circumstances, allowing courts to reopen judgment "*to prevent the operation of injustice.*" *Id.*

**40 - Waiver of Eleventh Amendment Immunity**

The Defendants demanded to retain state-court jurisdiction, but then refused to litigate claims; the state has thusly waived its Eleventh Amendment Immunity by invoking a federal court's removal jurisdiction, and then, rather than address the

allegations and constitutional concerns, the Defendants further violated and injured the Plaintiffs. *see Lapidis v. Board of Regents of University System of Georgia,* 287 F.3d 1374, 1378 (11th Cir. 2002).

**41 - Federal Recognition as a Basis for Reopening**

The Tenth Circuit's acceptance of Candice Kulbeth's *Amicus Curiae* brief in *Gaddy v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints*, No. 23-4110 (10th Cir. Sept. 19, 2025), is not merely symbolic but legally consequential. Courts have long held that extraordinary circumstances under Rule 60(b)(6) may include post-judgment developments that materially alter the legal landscape or expose systemic defects. *See Gonzalez v. Crosby*, 545 U.S. 524, 536 (2005); *Agostini v. Felton*, 521 U.S. 203, 239 (1997); *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001); *Phelps v. Alameida*, 569 F.3d 1120, 1135 (9th Cir. 2009). The appellate court's acceptance of that brief confirms that the structural harms alleged here—autonomy inversion, procedural foreclosure, and third-party entrapment—reflect a live constitutional fault line acknowledged within the federal judiciary. Accordingly, this Court is not merely empowered but doctrinally supported in reopening the judgment and addressing the constitutional questions now validated at the appellate level *(see Exhibit 29 - Gaddy amicus brief).*

**42 - Scholarly Context of the Constitutional Framework**

The constitutional framework discussed in this motion parallels arguments currently undergoing academic review regarding systemic barriers to constitutional adjudication. *See generally Candice Mason Kulbeth, Constitutional Black Holes: An Anti-Delegation Principle for Civil Adjudication* (Sept. 15, 2025) (manuscript under review by the *Harvard Law Review*), available at http://dx.doi.org/10.2139/ssrn.5487286.

That work analyzes the same structural phenomenon implicated here—where threshold doctrines such as *Rooker-Feldman* and judicial immunity can foreclose federal constitutional claims before merits review—and proposes a corrective model emphasizing judicial translation of religious content and preservation of federal forum access. Its in national scholarly review underscores that the constitutional questions presented in this motion are not only urgent but doctrinally significant, warranting judicial engagement.

**43 - Federal Forum Necessary**

The cumulative effect of these developments renders the state forum prospectively inadequate. Plaintiffs now face imminent incarceration, termination of legal custody and parental decision-making authority, reputational harm, property seizure, and deprivation of fundamental family rights without a neutral

venue. Federal review is not only appropriate—it is necessary. Accordingly, this Court should exercise its discretion to vacate the prior dismissal, reinstate the complaint, and permit full adjudication on the merits. For the reasons above—rooted in both ongoing harm and newly emergent procedural anomalies—Russel respectfully requests that this Court reopen the matter to prevent manifest injustice

**X. RELIEF REQUESTED**

For the reasons set forth above, Russel respectfully requests that this Court exercise its equitable discretion under Federal Rule of Civil Procedure 60(b)(6) to:

1. Vacate the prior judgment of dismissal entered in this matter;
2. Reopen Russel's 42 U.S.C. § 1983 action for further proceedings on the merits and to adjudicate whether Defendants' post-*Complaint* and post-judgment conduct violated Russel's due-process rights;
3. Stay enforcement of judicial orders in the state case *Marsh v. Marsh;*
4. Grant leave to amend the complaint to incorporate post-judgment facts and defendants necessary to provide full and fair adjudication of the constitutional claims; and
5. Enter such further orders as may be necessary to ensure a neutral forum and to protect Plaintiffs' federal rights pending final resolution.

This requested relief does not seek new findings of liability, but rather restoration of jurisdiction and opportunity for adjudication consistent with due process and equal protection of law. Accordingly, Plaintiff respectfully requests that this Court vacate its September 13, 2024 order of dismissal, reinstate the Complaint for adjudication on the merits, and issue a limited stay of state enforcement proceedings pending such adjudication.

Absent Rule 60(b)(6) relief, Plaintiffs face imminent loss of liberty, parental rights, and property without any adjudication on the merits — a result this Court should not countenance.

Respectfully submitted,

Kirk Russel Marsh
Plaintiff, Pro Se

October 9, 2025

**XI. TABLE OF EXHIBITS**

1 - MyCase Docket, *Marsh v Marsh,* showing judicial addition of *US Court of Appeals Fourth Circuit Informal Brief for Habeas,* October 15, 2024, and *Return of Electronic Notification,* October 21, 2024

2 - *Motion to Enforce and Order for Sanctions,* filed by Lauren Waddell Marsh Zimmer, December 17, 2024

3 - *Declaration of Mickala McHaffey RE Return of Service,* January 13, 2025, and Constable's Proof of Service, December 28, 2024

4 - Screenshots of Lauren Zimmer's phone call to Candice Kulbeth, March 3, 2025, and screenshots of texts between Lauren and Candice, March 3, 2025

5 - *Ex Parte Motion to Waive Mediation Requirement or in Alternative Compel Mediation and Memorandum in Support,* filed by Lauren Zimmer, February 12, 2025

6 - *Verified Petition to Modify Decree of Divorce,* filed by Lauren Zimmer, February 12, 2025

7 - *Memorandum Opposing Motion to Modify Decree of Divorce,* filed by Kirk Russel Marsh, February 27, 2025

8 - Emails concerning wisdom teeth extraction between Russel Marsh and Lauren Zimmer, March 8, 2023 - July 10, 2023

9 - *Notice of Case Management Conference,* filed by the Court, March 27, 2025

10 - *Declaration of Lauren Marsh Zimmer in Support of Motion to Enforce and Order for Sanctions,* December 16, 2024

11 - *Verified Reply to Kirk Russel Marsh's Memorandum Opposing Motion to Enforce and Order for Sanctions and in Further Support of Motion to Enforce and Order for Sanctions,* March 10, 2025

12 - Real Estate Records, Ben and Lauren Zimmer, December 09, 2024

13 - Emails concerning purchase of Health Insurance, between Lauren Zimmer and Russel Marsh, January 27, 2021 - February 3, 2021, and Ben Zimmer's Monthly invoice of Medical Insurance payments, November 5, 2024

14 - Financial Declaration of Lauren Zimmer, April 7, 2025

15 - Summons in a Civil Action of Judge Michael Edwards, March 29, 2025; certificate of certified mail RE. service of Edwards, April 3, 2024

16 - Agenda of Utah Judicial Conduct Commission, May 21, 2024

17 - Email from DOPL to Russel Marsh, July 25, 2024

18 - DOPL Stipulation and Order of Dana Emmons, August 2, 2024

19 - *Reply Supporting Defendants Judge Edwards and the State of Utah's Motion to Dismiss,* May 20, 2024

20 - *Order of Dismissal - Petition to Modify,* August 13, 2024

21 - *Objection to Request to Submit on Ex Parte Motion to Stay, February 25, 2025; Opposition to Opposition to Request to Submit on Ex Parte Motion to Stay,* February 26, 2025

22 - *Notice of Case Activity - US Court of Appeals Fourth Circuit Informal Brief for Habeas,* October 21, 2024

23 - "Elder W. Christopher Waddell: Trust in God is Personal, Family Motto," *Deseret News,* May 21, 2011

24 - DOPL Records re. Dana Emmons, October 7, 2024

25 - DOPL Records re. Dana Emmons, October 31, 2024

26 - *Findings of Fact and Conclusions of Law RE: Supplemental Decree of Divorce,* November 27, 2019

27 - *Kirk David and Shawnee Marsh Supplemental Brief,* May 12, 2024

28 - Emails re medical insurance premiums, June 27, 2023 - July 6, 2023

29 - Amicus Brief, *Gaddy v. COP,* September 19, 2025

30 - *Order on Hearing Dated July 14, 2025*